# Illinois Official Reports

## Appellate Court

---

### *People v. Brown*, 2015 IL App (1st) 134049

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CORDELROW BROWN, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-13-4049 |
| Filed | June 22, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-8264; the Hon. Noreen Valeria Love, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part; cause remanded. |
| Counsel on Appeal | Law Office of Luther Franklin Spence & Associates, of Maywood (Colin Quinn Commito and Luther Franklin Spence, of counsel), for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Carol L. Gaines, and Gina DiVito, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.<br>Presiding Justice Delort and Justice Connors concurred in the judgment and opinion. |

**OPINION**

¶ 1   This appeal arises from the denial of defendant Cordelrow Brown's posttrial motion to vacate his 2010 conviction on seven counts of first degree murder, including two counts of knowing murder and five counts of felony murder. Those murder charges arose from the 2010 death of Mycal Hunter, which resulted from injuries Hunter sustained during a 2007 gunfight involving the defendant and other individuals. In a prior trial in 2008-09 arising from the same gunfight, the defendant was convicted of five felonies for shooting at individuals other than Hunter: one count of aggravated battery with a firearm, one count of aggravated battery, and three counts of aggravated discharge of a firearm. However, at the 2008-09 trial, the defendant was also found not guilty by directed verdict of other charges with respect to Hunter, including attempted murder, aggravated battery with a firearm, aggravated battery, and aggravated discharge of a firearm. The defendant argues that, in light of his acquittal by directed verdict in the 2008-09 trial on those charges pertaining to Hunter, his 2010 murder prosecution for Hunter's subsequent death was barred by double jeopardy and collateral estoppel.

¶ 2                                                    BACKGROUND

¶ 3   The defendant has been tried twice for crimes arising out of a gunfight in the early morning hours of November 24, 2007 that eventually led to the 2010 death of Hunter, an innocent bystander. Hours before the shooting, on the night of November 23, 2007, the defendant had been involved in a brawl with numerous partygoers at a nightclub in Berwyn, Illinois. According to uncontroverted trial testimony, the defendant was one of several people who fought against another group that included three friends, Terrell Spencer, Michael Dixon, and Jarrett Swift. The fistfight was broken up by police and the participants left the nightclub. Spencer, Dixon, and Swift returned to Spencer's home following the incident.

¶ 4   Later that evening, Spencer, Dixon, and Swift drove together in Swift's sport utility vehicle (SUV) to a strip mall in Maywood, Illinois, to purchase drinks and food. Swift drove the SUV, Dixon was in the front passenger seat, and Spencer was in the backseat. After buying beverages at a gas station, the friends decided to purchase food from a sandwich shop elsewhere in the strip mall. After Swift stopped the SUV in front of the sandwich shop, Spencer left the vehicle to enter the store while Dixon and Swift stayed in the SUV. Spencer briefly entered the shop but returned to the SUV after he realized he had left his money in the vehicle. As he was opening the door of the SUV, Spencer suddenly saw the defendant, whom he recognized from the nightclub brawl, standing about five feet away from him with a gun. The defendant told Spencer words to the effect of "I caught you slipping," and began firing at Spencer.

¶ 5   Spencer jumped into the SUV and lay down on the floor of the vehicle, but was shot in his lower back. The defendant continued to fire rounds in rapid succession, breaking the SUV's rear window and firing into the vehicle. As the defendant continued to shoot, Dixon retrieved a 9-millimeter gun from beneath the passenger seat. Dixon fired approximately five shots toward the defendant but did not hit him. Shortly thereafter, the SUV sped away from the scene to a hospital, where Spencer was treated for his injury. Spencer recalled hearing 30 to 35 shots during the incident; police recovered approximately 29 shell casings from the parking lot.

¶ 6   At the same time, elsewhere in the parking lot, Hunter was sitting in the backseat of a car owned by his friend, Eric Stockley. The two men had come to the parking lot to attempt to

jump-start the car of another friend, who was also in Stockley's car at the time of the gunfight. Hunter did not know the defendant or any of the SUV's occupants. During the gun battle, a bullet entered Stockley's vehicle and struck Hunter in the neck, rendering him a quadriplegic and dependent upon a ventilator for the remainder of his life. For medical reasons, the bullet could not be removed from Hunter's neck during his lifetime.

¶ 7 In the early morning hours following the gunfight, Detective Elijah Willis attempted to speak to Spencer and Hunter at the hospital, but was unable to do so because they were receiving treatment. Shortly thereafter, Detective Willis spoke with Dixon, who stated that he had recognized the shooter as someone with the nickname "Cord" who lived in the neighborhood of 5th and Washington. Detective Willis, who knew that the defendant was called "Cord" and lived in the area Dixon described, prepared an array of photographs, including the defendant's photograph. Detective Willis showed the photo array separately to Dixon and Spencer, both of whom identified the defendant as the shooter. The defendant was arrested on December 28, 2007, after which Spencer and Dixon again identified the defendant in separate police lineups.

¶ 8 The defendant was subsequently charged with offenses relating to Hunter, Spencer, Swift, and Dixon. With respect to Spencer and Hunter, the defendant was charged with attempted murder, aggravated battery with a firearm, aggravated battery, and aggravated discharge of a firearm. The defendant was additionally charged with aggravated battery and aggravated discharge of a firearm with respect to both Swift and Dixon.

¶ 9 The defendant waived his right to trial by jury, and a bench trial commenced in December 2008. At trial, Spencer and Dixon testified that they recognized the defendant from the fight at the nightclub and identified the defendant as the individual who shot at the SUV. Dixon acknowledged that he had fired at the defendant with a 9-millimeter weapon, which was the only weapon recovered from the scene. Stockley testified that he was in his car with Hunter when Hunter was shot. Stockley recalled seeing the SUV drive away from the scene, but he did not see anyone firing a weapon or see anyone else running from the scene.

¶ 10 Officer Terrence Powell, an evidence technician, testified that he located 28 or 29 shell casings from a semiautomatic weapon, as well as several bullets. Officer Powell testified that the first shell casings were recovered near the sandwich shop, which was in the middle of the parking lot. He testified that based on the pattern of shell casings, the shooter had fired while moving from east to west across the parking lot. Officer Powell also testified that the car where Hunter was struck was on the east side of the parking lot and that no shell casings had been found in that area. No forensic evidence was presented at the first trial to identify which weapon had fired the bullet that struck Hunter in the neck.

¶ 11 At the close of the State's case, on January 28, 2009, the defendant moved for a directed verdict. The State opposed, arguing that the location of the vehicles and shell casings established that the defendant had fired eastward in the direction of the SUV and Stockley's car, whereas Dixon fired in the opposite direction, toward the defendant. Thus the State argued that the defendant must have fired the bullet that struck Hunter as he sat in Stockley's car. The trial court granted the directed verdict in part, explaining that it found "sufficient evidence *** as to the shooting of Mr. Terrell Spencer and the [SUV] that he was in. However I do not find there is sufficient evidence for the shooting of Mr. Mycal Hunter." Thus the court ruled that "as to the counts with Mr. Mycal Hunter *** the motion for directed finding is granted. There will be a finding of not guilty as to those." Thus, with respect to Hunter, the defendant was

acquitted of attempted murder, aggravated battery with a firearm, aggravated battery, and aggravated discharge of a firearm. The trial court otherwise denied the motion for directed verdict with respect to the remaining charges against the defendant related to Spencer, Dixon, and Swift.

¶ 12    The defense presented no evidence at the 2008-09 trial. After closing arguments, on January 28, 2009, the trial court found the defendant guilty of several felonies. Specifically, with respect to shooting Spencer, the defendant was convicted of aggravated battery with a firearm, aggravated battery, and aggravated discharge of a firearm. The defendant was also convicted of two counts of aggravated discharge of a firearm for shooting in the direction of Dixon and Swift. Initially, the trial court also found the defendant guilty of attempted murder as to Spencer, but the court acquitted him of that charge on March 18, 2009 after the defendant moved to reconsider the verdict. However, the trial court maintained its verdict of guilty on the five other felonies. On March 18, 2009, the defendant was sentenced to six years of incarceration for the offense of aggravated battery with a firearm and a concurrent sentence of four years for aggravated discharge of a firearm.

¶ 13    Hunter, who had been dependent upon a ventilator since the November 2007 shooting, died in January 2010. The State prosecuted the defendant for first degree murder in Hunter's death. The State did *not* charge intentional murder, but charged the defendant with two counts of knowing murder. See 720 ILCS 5/9-1(a)(2) (West 2010). The State also charged the defendant with five counts of felony murder, predicated on the five felony convictions from the 2008-09 trial for the offenses committed against Spencer, Swift, and Dixon. See 720 ILCS 5/9-1(a)(3) (West 2010).

¶ 14    The defendant again waived his right to jury trial, and in May 2013 a bench trial on the murder charges proceeded before a different judge than the judge who had presided over the 2008-09 trial. The State presented much of the same evidence it had set forth at the prior trial, including testimony from Spencer, Dixon, Stockley, and Detective Willis regarding the gunfight and the defendant's subsequent arrest. The State also elicited testimony from Dr. Jeff Harkey, an expert in forensic pathology, who had performed an autopsy on Hunter. Dr. Harkey testified that Hunter's death in 2010 resulted from blood loss caused by a complication of his ventilator dependency, which in turn stemmed from his gunshot wound in 2007. Thus, Hunter's death was considered a homicide. Dr. Harkey also testified that he had removed the bullet from Hunter's body following his death and provided it to investigators.

¶ 15    The State called Tonia Brubaker, a firearms examiner, who had analyzed evidence recovered from the parking lot, the SUV, and the bullet recovered from Hunter's body. Brubaker testified that the numerous shell casings recovered from the parking lot originated from the same weapon, but did not originate from the 9-millimeter gun recovered from the SUV. She also testified that the bullets recovered, including the bullet from Hunter's body, were from the same weapon but were not fired from the 9-millmeter weapon. Brubaker also testified that certain bullets recovered were mutilated such that their origin could not be conclusively identified. Because certain bullets recovered from the scene could not be tied to a particular weapon, Brubaker conceded on cross-examination that it was possible that up to four weapons were involved in the gunfight. However, Brubaker also stated it was possible that only two weapons were involved.

¶ 16    At the close of the State's case, the defendant moved for a directed verdict, arguing that the State's evidence "comes down to the testimony of two potential eyewitnesses," Spencer and

Dixon, as no weapon had been recovered from the defendant. The defendant's counsel argued that the police had failed to properly investigate other potential suspects, as there were "potentially up to four guns being fired." The State argued that, although certain bullets were mutilated, the evidence demonstrated that there were only two shooters, the defendant and Dixon, and that the shell casings and bullet recovered from Hunter's body were not fired by Dixon's 9-millimeter weapon.

¶ 17    The trial court denied the defendant's motion for a directed verdict. The defendant presented no live witnesses, but by way of stipulation offered testimony of a police officer, Officer Vargas, who had spoken to Spencer momentarily in the emergency room at the hospital after the shooting.

¶ 18    Following closing arguments, on May 7, 2013, the trial court found the defendant guilty on all seven charged counts of first degree murder. The trial court credited the identification testimony of Dixon and Spencer. With respect to the physical evidence, the court found "[t]he evidence is that these shell casings all came from the same weapon." The court found it was "somewhat of a red herring to talk about the possibility of a third or fourth weapon because there were not other casings that were found that would go to a different weapon," even if certain mutilated bullets could not be tied to one of the two known guns. In finding the defendant guilty with respect to all counts, the trial court noted that the defendant's "discharge of a firearm proximately caused the death of Mr. Mycal Hunter."

¶ 19    Following his conviction, in July 2013, the defendant submitted a *pro se* motion seeking a new trial on the grounds of ineffective assistance of counsel. Among other claims, the defendant alleged that his trial counsel should have argued that his 2009 directed verdict on the charge of attempted murder with respect to Hunter precluded his subsequent prosecution for Hunter's murder. At a hearing on July 12, 2013, the defendant claimed that his trial counsel had refused his request to raise this argument and had otherwise failed to communicate with him. On that date, the trial court denied the defendant's *pro se* motion and found that his trial counsel had not been ineffective. At the same time, the trial court granted the motion of the defendant's trial counsel to withdraw.

¶ 20    The defendant hired new counsel (counsel on this appeal), and on October 28, 2013 filed a motion seeking to vacate the murder conviction or obtain a new trial. That motion contended that, in light of the directed verdict in the first trial, the 2013 murder trial violated the defendant's right to protection from double jeopardy under the federal and state constitutions, as well as the Illinois statute barring a second prosecution for the same offense based on the same facts following an acquittal. See 720 ILCS 5/3-4(a)(1) (West 2010). The defendant's motion argued that the murder prosecution defied logic because "one must try to murder someone before they in fact murder them." Thus, the defendant argued that the directed verdict on the charge of the attempted murder of Hunter "foreclose[d] the presence of any other level of intent, express or implied." The motion further claimed that as a matter of collateral estoppel, the 2013 trial had improperly "re-litigat[ed] issues that had already been put to rest" in the 2008-09 trial, including whether the defendant intended to kill Hunter, whether the defendant discharged a firearm toward Hunter, and whether the defendant caused Hunter's injury.

¶ 21    At oral argument on December 6, 2013, the defendant's counsel argued that the State was collaterally estopped because the directed verdict in the first trial established that the defendant "never tried to kill" Hunter and did not "take any actions that resulted in any physical contact"

with Hunter. The defendant further argued that double jeopardy precludes a "prosecution for murder based on the same conduct for which the defendant has been previously acquitted on charges of attempt murder." The defendant conceded that the State could have prosecuted the defendant for murder had Spencer died after the first trial, "but not as far as [Hunter] is concerned, because that issue had been decided" by the 2009 directed verdict as to the charges concerning Hunter. As the responsibility for Hunter's injuries had been litigated in his favor, the defendant argued, the State could not use felonies committed against others as the basis for holding the defendant responsible for Hunter's death.

¶ 22    The State responded that there was no double jeopardy violation because the murder charge could not have been brought in the 2008-09 trial because Hunter did not die until 2010, albeit as a result of his original gunshot injury. The State also argued there was no preclusion by collateral estoppel because the felonies for which the defendant was acquitted by directed verdict were not the predicate felonies underlying the felony-murder counts in the 2013 murder prosecution.

¶ 23    On December 10, 2013, the trial court denied the defendant's posttrial motion. The trial court recognized that the charge of attempted murder "has a *mens rea* of intent" and remarked that, if the State had charged the defendant with intentional murder, "the State would have been barred because that issue would have already been decided" by the 2009 directed verdict. However, as the State's first degree murder charges did not have an intent element, the trial court found the prosecution was not precluded. On the same date, the defendant was sentenced to natural life in prison. The defendant filed a timely notice of appeal on December 27, 2013, and thus we have jurisdiction to decide his appeal. See Ill. S. Ct. R. 606(b) (eff. Feb. 6, 2013).

¶ 24                                        ANALYSIS

¶ 25    In his briefing and at oral argument, the defendant has raised numerous arguments that his murder conviction was precluded by double jeopardy and collateral estoppel. The defendant claims that, as the directed verdict in the 2008-09 trial acquitted of him of all charges with respect to Hunter, including the charge of attempted murder, the defendant could not later be prosecuted for Hunter's death. The defendant additionally argues that the trial court violated the "one-act, one-crime" rule in finding him guilty on multiple counts of felony murder arising from the same predicate act.

¶ 26    As the issues raised are ones purely of law, our standard of review is *de novo. People v. Artis*, 232 Ill. 2d 156, 161 (2009). Before turning to the merits, we address the State's contention that the defendant forfeited his double jeopardy arguments because they were not raised until a posttrial motion by the defendant's new counsel, following the withdrawal of the defendant's trial counsel. Our supreme court has held that "[t]he constitutional right to not be twice put in jeopardy for the same offense is a personal privilege which may be waived" where the accused "does not raise the defense of former jeopardy before judgment in the trial court." *People v. Scales*, 18 Ill. 2d 283, 285 (1960) (holding that double jeopardy claims could not be raised for the first time on appeal). The defendant in this case acknowledges that his former counsel failed to raise the issue before trial, but he argues that to impose forfeiture would cause "substantial injustice," especially as his new counsel promptly filed a motion to vacate his murder conviction.

¶ 27    Our supreme court has held that, even in cases where a defendant's "procedural default" on the issue is acknowledged, a double jeopardy claim may still be considered under the "plain

error rule," which may be invoked "where the error is so fundamental and of such magnitude that the accused was denied a fair trial" or "to preserve the integrity of the judicial process." *People v. Mink*, 141 Ill. 2d 163, 172-73 (1990). Under that analysis, the reviewing court "examine[s] the record to ascertain whether error occurred and, if so, then determine[s] whether the error must be regarded as plain error." *Id.* at 173. Thus, in order to determine whether any error occurred in this case, we will proceed to the question of whether the defendant was, in fact, improperly subjected to double jeopardy.

¶ 28 "Both our State and Federal Constitutions provide that no person shall be twice put in jeopardy for the same offense." *People v. Carrillo*, 164 Ill. 2d 144, 147 (1995). In a bench trial, jeopardy attaches when the first witness is sworn and the court begins to hear evidence. *People v. Ortiz*, 151 Ill. 2d 1, 10 (1992). "Jeopardy terminates when the jury arrives at a verdict, or when the trial judge enters a final judgment of acquittal." *People v. Henry*, 204 Ill. 2d 267, 283 (2003). The entry of a directed verdict "is an acquittal for purposes of double jeopardy when there was insufficient evidence to establish, as a matter of law, some or all of the essential elements of the crime." *Id.* at 283-84.

¶ 29 Our legislature has also provided that "[a] prosecution is barred if the defendant was formerly prosecuted for the same offense, based upon the same facts," if the former prosecution resulted in "an acquittal or in a determination that the evidence was insufficient to warrant a conviction." 720 ILCS 5/3-4(a)(1) (West 2010). A prosecution for a different offense is also barred if the former prosecution "was for an offense that involves the same conduct, unless each prosecution requires proof of a fact not required on the other prosecution, or the offense was not consummated when the former trial began." 720 ILCS 5/3-4(b)(1) (West 2010).

¶ 30 Generally, the "test for determining whether a subsequent charge is for the same or a different offense" for purposes of double jeopardy is "whether an additional element must be proven in the subsequently charged offense." *Carrillo*, 164 Ill. 2d at 147 (citing *Blockburger v. United States*, 284 U.S. 299, 304 (1932)). "Extrapolating from *Blockburger*, the [United States] Supreme Court has since held that where a lesser included offense has previously been charged, the greater offense cannot subsequently be charged without violating the double jeopardy clause. [Citations.]" *Id.* at 147-48. Thus, the logic of *Blockburger* would initially appear to preclude a prosecution for murder following a prosecution for the lesser included offense of attempted murder. However, "[i]n cases where double jeopardy might otherwise be implicated, an exception exists where the State is unable to proceed on the more serious charge at the outset because the additional facts necessary to sustain that charge have not yet occurred." *Id.* at 148 (citing *Diaz v. United States*, 223 U.S. 442, 448-49 (1912)). This exception recognizes that a murder prosecution cannot proceed until the victim's death has occurred.

¶ 31 Thus, in *Diaz*, the United States Supreme Court affirmed a homicide conviction despite the fact that the defendant had been convicted of assault and battery before the victim died from his injuries. *Diaz*, 223 U.S. 442. The court recognized that the two crimes, "although identical in some of their elements, were distinct offenses both in law and in fact" because the death of the victim was an element of homicide but not of assault and battery. *Id.* at 448-49. The court explained that: "At the time of the trial for [assault and battery] the death had not ensued, and not until it did ensue was the homicide committed. Then, and not before, was it possible to put the accused in jeopardy for that offense." *Id.* at 449.

¶ 32    In another case where the murder victim died only after an earlier prosecution for related crimes, the Illinois Supreme Court in 1995 applied what it termed "the *Diaz* exception" in holding that there was no double jeopardy bar to the murder prosecution. *People v. Carrillo*, 164 Ill. 2d 144, 148-49 (1995). As the defendant and the State both contend that *Carrillo* supports their respective positions, we review its facts and holding. In *Carrillo*, two defendants, Stacey and Carrillo, arranged a break-in at the apartment of the victim, who was Stacey's tenant, intending to frighten the victim into vacating the premises. *Id.* at 147. Carrillo and others broke into the apartment and robbed and shot the victim; Stacey was not present but "was looking down into [the victim's] apartment through a laundry chute when the shot was fired." *Id.* The victim initially survived the shooting, and Stacey and Carrillo were charged with attempted murder, home invasion, armed robbery, burglary, aggravated battery and armed violence. *Id.* Carrillo pleaded guilty to all counts. *Id.* Stacey was convicted of home invasion and burglary, but she was acquitted of attempted murder, armed robbery, aggravated battery and armed violence. *Id.*

¶ 33    After the victim in *Carrillo* died several years after the incident, Carrillo and Stacey were charged under multiple theories of first degree murder, including (1) intentionally killing the victim, (2) knowing that the shooting created a strong probability of death or great bodily harm, and (3) felony murder predicated on home invasion, burglary and armed robbery. *Id.* at 146. After the defendants moved to dismiss the indictments, the appellate court concluded that double jeopardy and collateral estoppel barred the intentional and felony-murder charges. *Id.* Our supreme court, however, concluded that pursuant to *Diaz*, the felony murder and intentional murder charges were "not barred by the double jeopardy clause because the defendants could not have been prosecuted for [the victim's] murder until her death." *Id.* at 149.

¶ 34    In this case, the defendant urges that the double jeopardy exception noted in *Diaz* does not apply in this instance because the first prosecution in *Diaz* resulted in a conviction with respect to the decedent, whereas the defendant in this instance was acquitted (through a directed verdict) of the charges in the first proceeding pertaining to the shooting of Hunter. The defendant argues that *Diaz* "does not apply to a second prosecution following acquittal." The defendant's briefing notes that several United States Supreme Court decisions have acknowledged *Diaz*, but emphasizes that none of them involved a situation where the initial proceeding had resulted in an acquittal.

¶ 35    The defendant's argument that application of the *Diaz* holding depends upon whether the initial prosecution resulted in conviction or acquittal is not availing under the facts of this case. As recognized by our supreme court, *Diaz* stands for the proposition that double jeopardy is no bar "where the State is unable to proceed on the more serious charge" in the first proceeding "because the additional facts necessary to sustain that charge have not yet occurred." *Id.* at 148 (citing *Diaz*, 223 U.S. at 448-49). The application of *Diaz* does not depend on the outcome of the first proceeding but, rather, is based on the recognition that certain facts necessary to support a charged offense may not yet exist at the time of the first prosecution for a lesser included offense. Indeed, the United States Supreme Court cases cited by the defendant acknowledge this rationale for the *Diaz* double jeopardy exception. See *Garrett v. United States*, 471 U.S. 773, 791 (1985) (citing *Diaz* in holding that double jeopardy did not bar subsequent prosecution for engaging in "continuing criminal enterprise" because that offense was not completed until after the defendant had been convicted of a lesser predicate offense);

*Brown v. Ohio*, 432 U.S. 161, 169 n.7 (1977) (noting that an "exception" to the bar on successive prosecution for an included offense "may exist where the State is unable to proceed on the more serious charge *** because the additional facts necessary to sustain that charge have not occurred" (citing *Diaz*, 223 U.S. at 448-49)). None of the authorities cited by the defendant indicate that the application of the *Diaz* holding is dependent upon whether the initial proceeding resulted in conviction or acquittal. Likewise, application of the *Diaz* exception in this case is consistent with our legislature's recognition that a subsequent prosecution for a different offense arising from the same conduct is barred "*unless *** the offense was not consummated when the former trial began.*" (Emphasis added.) 720 ILCS 5/3-4(b)(1) (West 2010). Thus, as Hunter had not yet died at the time of the defendant's 2008-09 trial, the logic of the *Diaz* holding applies and double jeopardy did not preclude the 2013 murder prosecution after an element of the offense had occurred, specifically, Hunter's death.

¶ 36    Moreover, the defendant's argument ignores the fact that, notwithstanding the directed verdict in his favor with respect to charges related to the shooting of Hunter, in the same proceeding he was *convicted* of five felonies for shooting at Spencer, Dixon, and Swift during the same incident. In this respect, this case resembles *Carrillo*: although defendant Stacey in that case had been acquitted of the attempted murder of the victim, our supreme court nonetheless held that she was subject to a later prosecution for felony murder since she had been convicted of home invasion and burglary in the same incident that later led to the victim's death. *Carrillo*, 164 Ill. 2d at 151-52.

¶ 37    The United States Supreme Court's holding in *Diaz* and our supreme court's holding in *Carrillo* expressly permit a subsequent prosecution for murder where the victim dies *after* an earlier prosecution for related offenses. In this case, as Hunter had not died at the time of the defendant's first prosecution, the subsequent prosecution for Hunter's murder was not barred on double jeopardy grounds. Thus, there was no error, let alone "plain error," on this basis.

¶ 38    Although we conclude that double jeopardy did not bar the defendant's 2013 murder prosecution, the defendant's arguments regarding collateral estoppel warrant additional analysis. See *id.* at 150-52 (acknowledging that collateral estoppel is a "component of the double jeopardy clause" but separately discussing its application). The defendant argues that collateral estoppel barred his prosecution for first degree murder because "the government used identical issues laid to rest in the first prosecution to secure the defendant's conviction in the second prosecution." Specifically, the defendant contends that the 2009 directed verdict in his favor settled the factual issues of whether the defendant acted intentionally or knowingly with respect to Hunter, or whether the defendant in fact fired the bullet that struck Hunter. The defendant argues that, due to the preclusive effect of these findings, the State was estopped from prosecuting him for Hunter's death.

¶ 39    "[C]ollateral estoppel in criminal contexts is a component of the double jeopardy clause." *Id.* at 151 (citing *Ashe v. Swenson*, 397 U.S. 436, 445-46 (1970)). "Under the collateral estoppel doctrine, 'when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.' " *People v. Jones*, 207 Ill. 2d 122, 138-39 (2003) (quoting *Ashe*, 397 U.S. at 443). "The party seeking to invoke collateral estoppel must show that: (1) the issue was raised and litigated in a previous proceeding; (2) that the determination of the issue was a critical and necessary part of the final judgment in a prior trial; and (3) the issue sought to be precluded in a later trial is the

same one decided in the previous trial. [Citation.] Where a defendant claims that a previous acquittal bars a subsequent prosecution for a related offense, the collateral estoppel rule requires a court to examine the record of the prior proceeding and determine whether a rational jury could have grounded its verdict on an issue other than the one which the defendant seeks to foreclose from consideration." *Id.* at 139.

¶ 40      A directed verdict in favor of a defendant "is an acquittal for purposes of double jeopardy when there was insufficient evidence" as to "essential elements of the crime." *Henry*, 204 Ill. 2d at 283-84. Thus, the directed verdict in the defendant's first trial has preclusive effect to the extent that it represented a determination of insufficient evidence to support the elements of the charged offenses. Notably, although the trial court in the first trial stated that it found insufficient evidence to support the charges pertaining to the shooting of Hunter, it did not specify which particular elements of the various offenses had not been proven.

¶ 41      In order to assess the preclusive effect of the directed verdict in the first proceeding, we first consider the requisite mental state for the underlying offenses of which the defendant was acquitted. First, with respect to the attempted murder charge, the defendant argues that the directed verdict established that he lacked the mental state to commit murder, as "[l]ogic dictates that an individual cannot successfully commit murder without trying to do so."

¶ 42      The defendant is correct only to the extent that the State was estopped from prosecuting him for *intentional* first degree murder after his 2009 acquittal for the attempted murder of Hunter. "Conviction for attempted murder requires proof of the specific intent to kill someone." *People v. Cunningham*, 376 Ill. App. 3d 298, 303 (2007). As attempted murder requires specific intent, an acquittal of attempted murder may have a collateral estoppel effect as to whether the defendant possessed the "inten[t] to kill or do great bodily harm" in order to support an intentional murder conviction. 720 ILCS 5/9-1(a)(1) (West 2010). Our supreme court reached this conclusion in *Carrillo*: as the defendant Stacey had been acquitted of attempted murder, the trial court "determined that there was reasonable doubt that Stacey had the requisite intent to kill or to cause great bodily harm." *Carrillo*, 164 Ill. 2d at 152. Thus, as a matter of collateral estoppel, Stacey could not be subsequently prosecuted for "murder based upon the intent to kill or cause great bodily harm." *Id.* As applied to this case, an intentional murder charge against the defendant would have been precluded by the prior directed verdict on the charge of attempted murder. And, indeed, the State elected not to bring such a charge against the defendant in its 2013 murder prosecution.

¶ 43      However, as emphasized by the State, the *Carrillo* court also held that Stacey's acquittal for attempted murder did *not* preclude her subsequent prosecution for first degree murder under the theory that she had "knowledge that the shooting *** created a strong probability of death or great bodily harm," as "[n]one of the charges previously faced by the defendants dealt with this knowledge and thus collateral estoppel is not implicated." *Id.* Likewise, Stacey's acquittal for attempted murder did *not* bar her subsequent prosecution for felony murder, which was predicated on her prior convictions for home invasion and burglary. *Id.* (noting that her felony-murder charge could not be predicated upon the felony of armed robbery, of which she had been acquitted). We note that it is well settled that a conviction for felony murder does *not* require an intent to kill. See *People v. Pugh*, 261 Ill. App. 3d 75, 77 (1994) ("It is immaterial whether the killing was intentional or accidental or was committed by a confederate without the connivance of the defendant ***."). Thus, the collateral estoppel effect of the defendant's acquittal on the charge of the attempted murder of Hunter, although it precluded a

- 10 -

finding of specific intent to kill Hunter, did not preclude the charges of knowing or felony murder.

¶ 44    We also consider the defendant's collateral estoppel argument with respect to the mental state elements of the other offenses for which the defendant was acquitted by the directed verdict: specifically, the aggravated battery of Hunter; the aggravated battery with a firearm of Hunter; and the aggravated discharge of a firearm toward Hunter. These are not specific intent crimes, but each of them requires at least a "knowing" mental state. The defendant was acquitted of aggravated battery in the 2008-09 trial pursuant to section 12-4(a) of the Criminal Code of 1961, which required that "[a] person who, in committing a battery, *intentionally or knowingly* causes great bodily harm *** commits aggravated battery." (Emphasis added.) 720 ILCS 5/12-4(a) (West 2008).[1] The offense of aggravated battery with a firearm–which at that time was separately codified in section 12-4.2 of the Criminal Code[2]–similarly required that the defendant "knowingly or intentionally by means of the discharging of a firearm" caused injury. 720 ILCS 5/12-4.2 (West 2008). Likewise, the crime of aggravated discharge of a firearm occurs when a defendant "knowingly or intentionally" fires "in the direction of another person or in the direction of a vehicle he or she knows or reasonably should know to be occupied." 720 ILCS 5/24-1.2(a)(2) (West 2008). Thus, the directed verdict in the defendant's favor on these charges indicates a finding of insufficient evidence that the defendant *knowingly* fired in the direction of Hunter or caused Hunter's injury. See *Jones*, 207 Ill. 2d at 140 ("[T]he aggravated battery acquittals show *** that the jury concluded that neither defendant nor one for whose conduct defendant was legally accountable pushed or struck [victim] with the intent to commit bodily harm or the knowledge that it would cause bodily harm.").

¶ 45    To the extent that the trial court in 2009 concluded that the defendant did not act with "knowledge" with respect to Hunter, the doctrine of collateral estoppel precludes a first degree murder conviction on the theory that the defendant "[knew]" that his "acts create[d] a strong probability of death or great bodily harm to that individual or another." 720 ILCS 5/9-1(a)(2) (West 2010). The State appears to have recognized this, as its brief acknowledges that "the People do not dispute that defendant's convictions [for knowing murder] under Counts one and two should be vacated." Accordingly, as the first two of the seven murder counts charged by the State were premised on a finding of "knowing" murder, we reverse the defendant's conviction with respect to those two counts.

¶ 46    Nevertheless, even if the State was collaterally estopped from proving either intentional or knowing murder by the 2009 directed verdict, any prior finding regarding the defendant's mental state did *not* preclude his subsequent prosecution for felony murder. That offense does

---

[1]Section 12-4 of the Criminal Code of 1961was repealed in 2011, when section 12-3.05 was enacted to define the various forms of aggravated battery. The current aggravated battery statutory provision, section 12-3.05(a) of the Criminal Code of 2012, similarly requires that the defendant act "knowingly." See 720 ILCS 5/12-3.05(a) (West 2012).

[2]In 2011, the distinct offense of "aggravated battery with a firearm" pursuant to section 12-4.2 of the Criminal Code was repealed in conjunction with the enactment of section 12-3.05, which enumerates various bases for the offense of "aggravated battery," including the use of a firearm. The Criminal Code now provides that a person commits aggravated battery "when, in committing a battery, he or she knowingly *** [d]ischarges a firearm *** and causes any injury to another person." 720 ILCS 5/12-3.05(e)(1) (West 2012).

- 11 -

not require a particular mental state, but requires only that the defendant was committing a forcible felony at the time he performed the acts which resulted in death. See 720 ILCS 5/9-1(a)(3) (West 2010). "Whether the perpetrator intended to kill the victim is irrelevant for purposes of the felony murder statute. [Citation.] The felony murder statute exists because forcible felonies are so inherently dangerous that a resulting homicide, even an accidental one, is strongly probable." *People v. Toney*, 337 Ill. App. 3d 122, 131 (2003).

¶ 47     Mental state, however, is only one of the factual issues that the defendant claims was "laid to rest" by the collateral estoppel effect of the directed verdict. The defendant further asserts that the directed verdict in his favor resolved the issue of whether the defendant fired the bullet that struck and injured Hunter, and that this factual finding precluded any murder charge.

¶ 48     The defendant is correct to the extent that certain of the offenses of which he was acquitted in the first trial required proof that the defendant actually fired the bullet that struck Hunter. That is, the charge of aggravated battery with a firearm required that the defendant "by means of the discharging of a firearm" "cause[d] any injury to another person." 720 ILCS 5/12-4.2(a) (West 2008). Similarly, a conviction for aggravated discharge of a firearm requires that an individual "[d]ischarges a firearm in the direction of another person or in the direction of a vehicle" occupied by a person. 720 ILCS 5/24-1.2(a)(2) (West 2008). The directed verdict on those charges indicates that the trial court determined that there was insufficient evidence that the defendant fired the bullet that struck Hunter. The record from the defendant's first trial supports that conclusion, since, shortly after the State argued that the defendant must have shot Hunter, the trial court stated: "I do not find there is sufficient evidence for the shooting of Mr. Mycal Hunter." In turn, as a matter of collateral estoppel, it appears that the 2009 directed verdict established a preclusive finding that the defendant did not fire the bullet that injured, and eventually killed, Hunter.

¶ 49     Nevertheless, even this factual finding did *not* preclude the defendant's subsequent conviction for felony murder. That is, the defendant could properly be convicted of felony murder even if he did not fire the shot that killed Hunter, if his commission of other felonies for which he was not acquitted nonetheless led to Hunter's death. This conclusion stems from Illinois's application of the "proximate cause theory" of the felony-murder rule, under which "liability attaches *** for any death proximately resulting from the unlawful activity–notwithstanding the fact that the killing was by one resisting the crime." *People v. Lowery*, 178 Ill. 2d 462, 465 (1997).

¶ 50     Our supreme court's decision in *Lowery* illustrates that culpability for felony murder can arise even where the defendant did not fire the fatal shot but nonetheless caused the victim's death. In *Lowery*, the defendant attempted to commit an armed robbery, but the intended victim resisted and gained control of the defendant's gun. *Id.* at 464. The intended victim fired at the defendant, but shot and killed a bystander. *Id.* Our supreme court thus addressed "whether the felony-murder rule applies where the intended victim of an underlying felony, as opposed to the defendant or his accomplice, fired the fatal shot which killed an innocent bystander." *Id.* at 465.

¶ 51     Our supreme court upheld the defendant's first degree murder conviction under the proximate cause theory of felony murder. The court found it was "consistent with reason and sound public policy to hold that when a felon's attempt to commit a forcible felony sets in motion a chain of events which were or should have been within his contemplation when the motion was initiated, he should be held responsible for any death which by direct and almost

inevitable sequence results from the initial criminal act." *Id*. at 467 (adding that "the intent behind the felony-murder doctrine would be thwarted if we did not hold felons responsible for the foreseeable consequences of their actions"). Our supreme court thus agreed that the *Lowery* defendant was liable for murder because it was reasonably foreseeable that the intended robbery victim would retaliate against the defendant. *Id*. at 470. The fact that the defendant did not fire the fatal shot did not matter: "If decedent's death resulted from [the robbery victim] firing the gun as defendant attempted to flee, it was, nonetheless, defendant's action that set in motion the events leading to the victim's death." *Id*.

¶ 52    It is thus established that one may be guilty of felony murder even where the fatal shot was fired by someone else, so long as the death was proximately caused by the defendant's felony. In the case at bar, it follows that, even if the first trial determined that there was insufficient evidence that the defendant fired the bullet that struck Hunter, the defendant was nonetheless subject to felony-murder liability if his commission of a forcible felony set in motion the chain of events leading to Hunter's death.

¶ 53    The trial court in 2009 convicted the defendant of several forcible felonies after hearing testimony that the defendant initiated the gunfight and fired numerous bullets in the direction of the SUV's occupants, prompting Dixon to return fire. Although that court did not determine that the defendant fired the bullet that struck Hunter, it was undisputed that Hunter was struck in the neck as a result of the gunfight that the defendant initiated. After Hunter's death from his injury sustained in the shooting initiated by the defendant, the trial court in 2013 considered the same evidence from the 2008-09 trial and found that the defendant's felonies in shooting at Spencer, Swift, and Dixon were the proximate cause of Hunter's eventual death. The record and established case law support the defendant's culpability for felony murder, regardless of whether he actually fired the fatal bullet that struck Hunter. Thus, to the extent the directed verdict found insufficient evidence that the defendant discharged the bullet that struck Hunter, that finding, as a matter of collateral estoppel, did *not* preclude his later conviction for felony murder once Hunter died. See *Carrillo*, 164 Ill. 2d at 152 (holding that, although she did not fire the fatal shot, the defendant could be charged with felony murder based on her prior convictions for home invasion and burglary).

¶ 54    Finally, the defendant argues that it was improper to permit his conviction on three counts of felony murder "using the predicate felonies of aggravated discharge of a firearm, aggravated battery with a firearm and aggravated battery when each charge arose out of the same physical act: discharging a bullet from a firearm that hit Terrell Spencer." The defendant is correct on this point. In reaffirming the "one-act, one-crime doctrine," our supreme court has recognized that " '[p]rejudice results to the defendant only in those instances where more than one offense is carved from the same physical act.' " *People v. Artis*, 232 Ill. 2d 156, 161 (2009) (quoting *People v. King*, 66 Ill. 2d 551, 566 (1977)). Moreover, our supreme court has held that "[a] defendant cannot be convicted of more than one murder arising out of the same physical act." *People v. Pitsonbarger*, 142 Ill. 2d 353, 377 (1990).

¶ 55    In this case, the single act of shooting Spencer could not support three separate felony murder convictions for Hunter's death. The State concedes: "[A]lthough defendant was convicted of five separate counts of felony murder, because there is only one person murdered, the mittimus should reflect only the natural life sentence for one count of first degree felony murder."

- 13 -

¶ 56     Our supreme court has held that "under the one-act, one-crime doctrine, sentence should be imposed on the more serious offense and the less serious offense should be vacated." *Artis*, 232 Ill. 2d at 170. "When multiple murder convictions have been entered for the same act, the less culpable convictions must be vacated." *Pitsonbarger*, 142 Ill. 2d at 377-78 (affirming convictions for intentional murder but vacating felony murder convictions arising from same acts).

¶ 57     In this case, although the defendant was convicted of five counts of felony murder arising from the same act, the defendant should be sentenced only on the single "most serious" count of felony murder. The parties' briefs do not offer any suggestion as to which of the five felony murder offenses was the "most serious." However, in determining which felony-murder count is the most serious, it is logical to compare the punishments available for each of the predicate felonies. See *In re Samantha V.*, 234 Ill. 2d 359, 379 (2009) ("In determining which offense is the most serious" under the one-act, one-crime doctrine, "we are instructed to consider the plain language of the statutes, as common sense dictates that the legislature would prescribe greater punishment for the offense it deems the more serious.").

¶ 58     The five felony convictions from the defendant's first trial, which were used to support the five felony-murder counts in his subsequent trial, consisted of three counts of aggravated discharge of a firearm, one count of aggravated battery, and one count of aggravated battery with a firearm. In reviewing the statutory penalties for these predicate felonies, aggravated battery with a firearm was the only predicate offense punishable as a Class X felony and thus appears to be the "most serious." That is, aggravated discharge of a firearm, the predicate offense for three of the five felony-murder counts of which the defendant was convicted, is punishable as a Class 1 felony. 720 ILCS 5/24-1.2(a)(2), (b) (West 2008). A Class 1 felony is generally punishable by a sentence of "not less than 4 years and not more than 15 years." 730 ILCS 5/5-4.5-30(a) (West 2012). The defendant's aggravated battery conviction in the first trial was a Class 3 felony under section 12-4 of the Criminal Code, which governed that offense at the time the defendant committed the crimes. 720 ILCS 5/12-4(a) (West 2008). A Class 3 felony is punishable by "a determinate sentence of not less than 2 years and not more than 5 years." 730 ILCS 5/5-4.5-40(a) (West 2012). Although section 12-4(a) has since been repealed and the offense of aggravated battery is now codified in section 12-3.05, that section likewise states that "[u]nless otherwise provided, aggravated battery is a Class 3 felony." 720 ILCS 5/12-3.05(h) (West 2012).

¶ 59     In contrast, the defendant's conviction for "aggravated battery with a firearm" was punishable as a Class X felony under section 12-4.2 of the Criminal Code then in effect. 720 ILCS 5/12-4.2(b) (West 2008). A Class X felony is punishable by "a determinate sentence of not less than 6 years and not more than 30 years." 730 ILCS 5/5-4.5-25(a) (West 2012). Although section 12-4.2 was eventually superseded by section 12-3.05, the current statute similarly provides that aggravated battery committed with a firearm is a Class X felony. 720 ILCS 5/12-3.05(e)(1), (h) (West 2012).

¶ 60     Thus, of the five felony-murder counts for which the defendant was convicted, the count predicated on the defendant's earlier conviction for aggravated battery with a firearm, which is a Class X felony, appears to be the "most serious" for purposes of determining which count should remain after application of the one-act, one-crime doctrine. Thus, the defendant should only be sentenced for that single count of first degree murder.

¶ 61　　　　The State's brief suggests that we should simply correct the mittimus to reflect a natural life sentence for one count of first degree felony murder. However, in similar situations, we have exercised our discretion to remand the case to the trial court for resentencing of the defendant on the single most serious murder charge. For example, in *People v. Rodriguez*, 336 Ill. App. 3d 1 (2002), we held:

> "Because the trial court imposed sentences upon defendant's convictions of knowing and felony murder–convictions that we previously vacated–we must also vacate defendant's sentences for knowing and felony murder and remand for resentencing solely upon defendant's conviction for intentional murder. As our supreme court noted in *People v. Cardona*, 158 Ill. 2d 403, 414 (1994), the trial court's considerations in imposing sentence on a single conviction rather than multiple murder convictions might now be different." *Id.* at 19.

Similarly, in this case, the trial court might have different sentencing "considerations" on remand in light of our holding that the defendant's convictions on the two counts of knowing murder were precluded by collateral estoppel and that the sentence should be based on only one of the five remaining felony-murder counts.

¶ 62　　　　We therefore vacate the defendant's convictions on the two charged counts of knowing murder, as well as his convictions based upon the three counts of felony murder predicated upon his prior convictions for aggravated discharge of a firearm and the count of felony murder predicated upon the defendant's prior conviction for aggravated battery. We affirm the defendant's conviction for the single count of felony murder predicated upon the defendant's prior conviction for aggravated battery with a firearm. We therefore remand the case to the trial court to resentence the defendant on that felony murder count in accordance with this opinion.

¶ 63　　　　Affirmed in part and vacated in part; cause remanded.